82,832-01

# SUPPLEMENTAL

## POST CONVICTION WRIT OF HABEAS CORPUS

### (ARTICLE 11.07, V.A.C.C.P.)

### CAUSE NO. 2009-385-C2A

### EX PARTE:

### BOBBY JOE BUCKNER, APPLICANT

#### ADDRESS:

MR. BOBBY JOE BUCKNER
TDCJ-ID #01740805
ESTELLE UNIT
264 FM 3478
HUNTSVILLE, TEXAS 77320

This document contains some pages [...] quality at the time of imaging.

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 23 2015

Abel Acosta, Clerk

#### FROM:

JON R. GIMBLE, DISTRICT CLERK
McLENNAN COUNTY COURTHOUSE
P.O. BOX 2451
WACO, TEXAS 76703

### JUDGE MATT JOHNSON, PRESIDING

### IN THE DISTRICT COURT

### 54TH JUDICIAL DISTRICT

### McLENNAN COUNTY, TEXAS

### ATTORNEY FOR PETITIONER:

### PRO SE

### ATTORNEY FOR THE STATE:

ABEL REYNA, DISTRICT ATTORNEY
McLENNAN COUNTY COURTHOUSE ANNEX
WACO, TEXAS 76701

| | |
|---|---|
| Ex Parte | § Application for |
| | § Writ of Habeas Corpus |
| | § From |
| | § McLennan County, Texas |
| BOBBY JOE BUCKNER | § 54TH District Court |

## TRIAL COURT WRIT NO. 2009-385-C2A

# CLERK'S SUMMARY SHEET

**APPLICANT'S NAME:** . . . . . . . . . . . . . .
(As reflected on the Judgment)

**BOBBY JOE BUCKNER**

**OFFENSE:** . . . . . . . . . . . . . . . . . . . . . . . .
(As reflected on the Judgment)

**AGGRAVATED SEXUAL ASSAULT
OF A CHILD**

**CAUSE NO.:** . . . . . . . . . . . . . . . . . . . . . .
(As reflected on the Judgment)

**2009-385-C2**

**PLEA:** . . . . . . . . . . . . . . . . . . . . . . . . . . .
(As reflected on the Judgment)

**NOT GUILTY**

**SENTENCE:** . . . . . . . . . . . . . . . . . . . . . .
(As described on the Judgment)

**TIME: 50 YRS TDCJ**

**TRIAL DATE:** . . . . . . . . . . . . . . . . . . . . .
(Date upon which sentence was imposed)

**JULY 15, 2011**

**JUDGE'S NAME:** . . . . . . . . . . . . . . . . . .
(Judge Presiding at Trial)

**HON. GEORGE ALLEN**

**APPEAL NO.:** . . . . . . . . . . . . . . . . . . . . .
(If applicable)

**10-11-00277-CR**

**CITATION TO OPINION:** . . . . . . . . . . .
(If any)

**NONE**

**OTHER APPELLATE ACTIVITY:** . . .

**NONE**

**HEARING HELD:** . . . . . . . . . . . . . . . . . .
(Pertaining to the Application for Writ)

_____YES ____✓____NO

**FINDINGS & CONCLUSIONS FILED:**
(Pertaining to the Application for Writ)

_____✓____YES _____NO

**RECOMMENDATION:** . . . . . . . . . . . . .
(Trial Court's recommendation regarding application)

____GRANT _✓_DENY___NONE

**JUDGE'S NAME:** . . . . . . . . . . . . . . . . . .
(Judge Presiding over Habeas Proceeding)

**HON. MATT JOHNSON**

CAUSE No. 2009-385-C2A

| | | |
|---|---|---|
| EX PARTE: | § | IN THE DISTRICT COURT |
| BOBBY JOE BUCKNER | § | 54th JUDICIAL DISTRICT |
| APPLICANT | § | McLENNAN COUNTY, TEXAS |

### INDEX

INDEX ................................................................... 1

NOTICE FROM COURT OF CRIMINAL APPEALS - WRIT RECEIVED............................. 2

COVER LETTER FROM DEFENDANT ....................................................... 5

APPLICANT BUCKNER'S TRAVERSE TO THE STATE'S ORIGINAL
ANSWER WITH BRIEF IN SUPPORT ...................................................... 7

DOCKET SHEET ...................................................................... 54

CLERK'S CERTIFICATE ............................................................... 55

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS    FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

**2/6/2015**
**BUCKNER, BOBBY JOE   Tr. Ct. No. 2009-385-C2A        WR-82,832-01**
On this day, the application for 11.07 Writ of Habeas Corpus has been received
and presented to the Court.

Abel Acosta, Clerk

DISTRICT CLERK MCLENNAN COUNTY
JON GIMBLE
P.O. BOX 2451
WACO, TX 76703
* DELIVERED VIA E-MAIL *



**2/6/2015**
**BUCKNER, BOBBY JOE   Tr. Ct. No. 2009-385-C2A              WR-82,832-01**
On this day, the application for 11.07 Writ of Habeas Corpus has been received
and presented to the Court.

Abel Acosta, Clerk

BOBBY JOE BUCKNER
ESTELLE UNIT - TDC # 1740805
264 FM 3478
HUNTSVILLE, TX 77320-3322

2/6/2015
**BUCKNER, BOBBY JOE   Tr. Ct. No. 2009-385-C2A**          **WR-82,832-01**
On this day, the application for 11.07 Writ of Habeas Corpus has been received
and presented to the Court.

Abel Acosta, Clerk

DISTRICT ATTORNEY MCLENNAN COUNTY
ABELINO 'ABEL' REYNA
219 N. 6TH STREET, SUITE 200
WACO, TX  76701
* DELIVERED VIA E-MAIL *

February 09, 2015

**McLennan County District Clerk**
501 Washington Avenue #300
Waco, Texas 76701

2009-385-C2A



Re:      Ex parte Bobby Joe Buckner, Case No. 2009-385-C2 (In the 54th Judicial District Court of McLennan County, Texas).

      ➢   Brief in Support of Application for Writ of Habeas Corpus

Dear Clerk:

Enclosed please find a copy of Applicant Buckner's Brief in Support of his Original Application for Writ of Habeas Corpus, which is currently pending in the Court of Criminal Appeals, Writ No. WR-82,832-01, transmitted there by this office on or about February 06, 2015. Please file this copy among the papers in the above-styled and numbered cause and forward a copy to the Court of Criminal Appeals as a Supplemental Record to the instant case previously transmitted.

Please advise Applicant of the date of filing and disposition of these proceedings. By copy of this letter, Applicant is forwarding a true and correct copy of this instrument to the McLennan County District Attorney's Office.

Thank you for your kind attention to this matter.

Sincerely,

Bobby J. Buckner, #01740805
Estelle Unit
264 FM 3478
Huntsville, Texas 77320

Enclosure

Cc:    McLennan County District Attorney

       Abel Acosta, Clerk
       Texas Court of Criminal Appeals

       File

Mr. Bobby J. Buckner, #01740805
Estelle Unit
264 FM 3478
Huntsville, Texas 77320



McLennan County District Clerk
501 Washington Avenue #300
Waco, Texas 76701





U.S. POST.
$2.6
FCM LG
7707
Date of sale
03/15/1
06    2S0
0833595

**USPS® FIRST-CLASS MAIL**

SHIP
TO:                                        0

**WACO TX 76701**

ZIP

(420) 76701



FILED

2015 MAR 20 AM 10: 22

JON R. GIMBLE
DISTRICT CLERK
MCLENNAN CO. TX.

CASE NUMBER: 2009-385-C2A

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
| BOBBY JOE BUCKNER | § | 54TH JUDICIAL DISTRICT |
| TDCJ-CID#01740805. | § | MC LENNAN COUNTY, TEXAS |

## APPLICANT BUCKNER'S TRAVERSE TO
### THE STATE'S ORIGINAL ANSWER WITH BRIEF IN SUPPORT

## TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Bobby J. Buckner, Applicant, proceeding in pro se, in the above-styled

and numbered cause and files this, his Traverse to the State's Original Answer with Brief in

Support and in support thereof, would respectfully show the Court as follows:

### I.
### Jurisdiction

The Court has subject matter jurisdiction over the parties and these proceedings pursuant

to Article 11.07, V.A.C.C.P., *et seq.*

### II.
### Confinement & Restraint

Applicant is being illegally deprived of his liberty by virtue of a judgment and conviction

for the felony offense of Aggravated Sexual Assault of a Child in Case Number 2009-385-C2A

entered on July 15, 2011, after a jury found him to be guilty and sentenced him to fifty-years

1 6 6 4 5 2 2 7 1          7

confinement in TDCJ-CID. A direct appeal was taken to the Tenth Court of Appeals, who affirmed the judgment and sentence on July 11, 2013, in an unpublished opinion. Applicant then filed a Petition for Discretionary Review with the Court of Criminal Appeals in Case Number PD-1056-13, who refused same on September 08, 2013. Applicant then filed an application seeking habeas corpus relief, which the State answered on December 19, 2014. The trial court then designated issues to be resolved on December 23, 2015. As part and parcel to the designation of issues ordered to be resolved, the Court ordered both trial and appellate counsel's to prepare and file affidavits with the clerk of the court responding to the allegations of ineffective assistance of counsel contained within Applicant's original writ application. Mr. Alan Bennett, appellate counsel, filed his affidavit on January 15, 2015 and Mr. John Donahue, trial counsel, filed his affidavit on January 21, 2015. This proceeding followed.

## III.

### Statement of Facts

The indictment alleges in pertinent part that, on or about April 28, 2000, Applicant did:

> then and there intentionally or knowingly cause the sexual organ of [A.L.]
> to contact or be penetrated by the sexual organ of the Defendant, and at the
> time, [A.L.] was a child who was then and there younger than fourteen (14)
> years of age and not the spouse of the Defendant.(C.R. at 6).

Waco Police Detective Maria Bucher works in the Crimes against Children Unit. (4 R.R. at 15). Bucher investigated the allegations made by the complainant A.L. in 2008.

2

8

(4 R.R. at 16-17). Bucher personally interviewed A.L. who was then fifteen years' old. (4 R.R. at 19). She then contacted A.L.'s grandmother Margaret, to whom A.L. had first reported the allegations. (4 R.R. at 20). Based on Bucher's interview with A.L. and subsequent conversations with Margaret and A.L.'s mother Sanya, Bucher obtained a warrant for Applicant 's arrest. (4 R.R. at 23-24).

A.L. was eighteen at the time of trial. (4 R.R. at 36). Her mother was dating Applicant when A.L. was in first grade. (4 R.R. at 38). Because there was no father in the home, A.L.'s grandmother was very involved in her upbringing, and A.L. considered her grandmother as one of her parents. (4 R.R. at 37, 40). One afternoon in April 2000, Applicant picked her up from school and took her to her apartment. She was seven years' old at the time. (4 R.R. at 43-44, 50). They watched cartoons. (4 R.R. at 44-45). A.L. testified that Applicant asked if she could keep a secret. She knew that her mother did not usually allow her to have candy, so she asked if she could have some candy. He told her that she could, so she went and got some then returned. She did not remember his words, but he later had her lay down in the living room. (4 R.R. at 45). A.L. was born with a bladder condition that required a great deal of medical treatment in her younger years. She assumed his actions were an effort to help with this condition so she did not question when he started undoing her skirt. (4 R.R. at 46). The living room windows were partially open. A.L. was embarrassed and said, "Not in here," or words to that effect. Applicant

3

told her to go in the bathroom and take off her clothes. As best she could recall, he told her to meet him in the bedroom of the single-bedroom apartment after that. (4 R.R. at 47).

A.L. recalled that Applicant was at the foot of the bed and told her to lay down. She testified that he spread her legs. (4 R.R. at 48). He touched her thighs and spread her legs. (4 R.R. at 51). She asked if he could help her with her bladder problem, and he said he could. (4 R.R. at 51-52). He then unfastened his pants and pulled out his penis. (4 R.R. at 53-54). She looked away and does not remember whether he did anything to her with his penis. She does recall feeling pain when she got dressed. (4 R.R. at 54). She later testified that he put his penis inside her vagina. (4 R.R. at 59). On cross-examination she testified that, "either using his body or something else, he must have penetrated [her] because the pain afterwards was so excruciating." (4 R.R. at 94). She does not recall any discharge or bleeding after the incident. (4 R.R. at 95).

The relationship between Applicant and her mother did not continue much longer after the April 2000 occurrence. He never made any other sexual advances toward her, but she does recall that he displayed a pocketknife one time which she took to be a threatening gesture. She felt as though he was threatening her not to tell her mother. (4 R.R. at 55).

She told her grandmother part of what happened October of the following year. (4

R.R. at 55). She told her grandmother only that Applicant had touched her inappropriately. (4 R.R. at 98). Then her grandmother told her mother. (4 R.R. at 62). She did not tell either of them that intercourse was involved. When she was fourteen, she generally described what happened to her boyfriend R.S. (4 R.R. at 63-64). He convinced her to tell her mother and grandmother all the details, and she did. Her grandmother "badgered [her] for a year" before she reported it to the police. (4 R.R. at 64).

A.L. remembers very little about her mother's relationship with Applicant or about the other details of what happened on the date in question. (4 R.R. at 85-87). However, she did recall that this was the third time she had actually been in contact with Buckner. (4 R.R. at 87). Before then, they had never really even had any conversations. (4 R.R. at 89). None of her mother's other boyfriends ever picked her up from school. (4 R.R. at 92).

R.S. testified that he first met A.L. at a church youth convention held in Waco in early January 2006. At the time, he lived in Manor, which is in the Austin area. (5 R.R. at 8-9). After about a month and a half, they were boyfriend and girlfriend. (5 R.R. at 10). They maintained this relationship for about five months. (5 R.R. at 11). He "believed" that he recalled A.L. telling him, somewhere in the middle of their relationship, about being abused as a young child. (5 R.R. at 11-12). R.S. encouraged her to tell an adult

what had happened. (5 R.R. at 12). He encouraged her to do so "maybe once or twice." (5 R.R. at 14).

A.L.'s mother Sanya testified that, growing up, A.L. could be "playful," "depressed sometimes," "in a happy mood," but "when we were living in Waco, she definitely was not in a good mood and she just—she wasn't a happy kid because she was always scared." She clarified that A.L. was "scared" and not "in a happy mood" "after she was raped by the defendant." (5 R.R. at 17). Sanya met Applicant when her car broke down after work one day in mid to late March. He pushed her car to the side of the road and took her to a gas station so she could call her grandfather. (5 R.R. at 23, 25). They exchanged telephone numbers. (5 R.R. at 23-24). Applicant called her sometime later, and they started dating. (5 R.R. at 24-25). She introduced him to A.L. and to her mother a couple of weeks later. (5 R.R. at 25). She recalls having Applicant pick A.L. up from school "about two times." (5 R.R. at 36). She gave Applicant her key to the apartment, and he stayed there during the day when he was unemployed. He lived there for about two weeks in addition to spending the night on other occasions. (5 R.R. at 38). Sanya recalled that during the end of April or early May A.L. no longer wanted to live in the apartment and wanted to spend as much time as possible with Sanya's mother. (5 R.R. at 39-40).

Applicant and she ended their relationship in early to mid-May. (5 R.R. at 40). She recalled that A.L. did not want Buckner to come back after they ended the relationship. (5 R.R. at 41). Sanya also recalled that, after first grade, A.L. no longer wanted to see a male doctor, so Sanya found a female doctor for her. (5 R.R. at 42). As A.L. grew older, she started wearing "darker colors and she was getting more depressed and she wasn't happy." She began seeing a therapist when she was eight or nine years old at the recommendation of a physician. (5 R.R. at 44). She tried to commit suicide a few times. (5 R.R. at 45-46). "She was diagnosed with ADHD and depression." (5 R.R. at 47). About a year and a half after Applicant and Sanya ended their relationship, Sanya's mother told Sanya that A.L. told her Applicant had done something to her. (5 R.R. at 49). A.L. told them only that he had touched her inappropriately. (5 R.R. at 52-53). Sanya did not report this to the police because A.L. did not want it to be reported. (5 R.R. at 53-54).

A.L. did not tell her mother and grandmother all that happened until sometime in 2007, after she was dating R.S. (5 R.R. at 55, 60). She told them that Applicant "raped" her, which Sanya took to mean that he forced her to have sexual intercourse. (5 R.R. at 60-61). Sanya finally convinced A.L. that they should report this to the police in 2008. (5 R.R. at 61). A.L. told Sanya that she was reluctant to tell what happened because "she was afraid [Applicant ] would kill her and [Sanya and Margaret]" and "that he had

threatened to hurt us." A.L. did not want to testify because she was afraid he would kill her. (5 R.R. at 62).

A.L.'s grandmother Margaret described her as a "[h]appy little go-lucky girl" in her younger years. (5 R.R. at 94-95). When Sanya introduced Applicant to Margaret, Margaret told Buckner that she did not approve of him. (5 R.R. at 96-97). To Margaret, Applicant "felt evil" just from looking at him. (5 R.R. at 97). Margaret does not know whether A.L. ever heard her tell Sanya that she did not approve of Applicant. (5 R.R. at 130). Consistent with A.L.'s testimony, Margaret testified that A.L. told her that Applicant had touched her inappropriately when they were watching a scary movie. (5 R.R. at 110-11). A.L. also told her that Applicant said "he would kill me and kill y'all." At that time, A.L. did not say that Buckner had raped her. (5 R.R. at 111). Margaret did not call the police because A.L. did no want her to. So she told Sanya a few days later. (5 R.R. at 113). Margaret later found out that Applicant had raped A.L. (5 R.R. at 119). She did not report this to the police either because A.L. did not want her to. (5 R.R. at 119-20).

At some point after A.L. made her initial outcry to Margaret, A.L.'s pediatrician asked Margaret whether anyone had ever touched A.L. inappropriately. Margaret told him, "No." (5 R.R. at 137-38). Clinical Psychologist Deborah Brock treated A.L. in 2004-

05. (5 R.R. at 210-12). Over Applicant's objection, Dr. Brock testified that Sanya informed her that A.L. had been inappropriately touched "several years before." (5 R.R. at 216). A.L. confirmed this but did not elaborate. She made no other allegations of sexual abuse during the course of her treatment. (5 R.R. at 217). However, Dr. Brock did not believe A.L. seemed reluctant to provide further details of the touching incident. (5 R.R. at 234-35). Dr. Brock specifically inquired whether this incident involved intercourse or oral sex, and A.L. denied both. (5 R.R. at 235). They developed "a fair relationship" during the course of A.L.'s treatment, which lasted about 21 months. (5 R.R. at 221). She thinks A.L. "felt comfortable" with her. (5 R.R. at 228). A.L. was also aware that Dr. Brock would occasionally discuss issues with Sanya and Margaret that arose during sessions, which would be a reason for her to be hesitant to discuss matters she did not want them to know about. (5 R.R. at 229). Nevertheless, A.L. did freely talk with Dr. Brock about problems she had with boys, with Sanya, with Margaret, and with herself. (5 R.R. at 232). During the charge conference, Applicant requested that the jury be charged on this lesser-included offense of indecency with a child, but this request was denied. (5 R.R. at 237-38).

The jury found Applicant guilty of aggravated sexual assault as charged. (C.R. at 61), (6 R.R. at 48). Applicant pleaded "true" to the allegation of a prior felony conviction

for enhancement purposes. (7 R.R. at 6). He elected to have the court assess his punishment. After hearing the punishment evidence, the court Applicant's punishment at fifty years' imprisonment. (C.R. at 63-64), (7 R.R. at 66-67).

## IV.

### Issues Presented

1. Applicant is actually innocent of the instant offense of aggravated sexual assault of a child;

2. Applicant complains he was denied the effective assistance of counsel at trial in violation of the Sixth Amendment;

3. Applicant complains he was denied the effective assistance of counsel on his first appeal of right in violation of the Sixth Amendment;

4. Applicant complains that the trial court erred and abused its discretion denying him due process and a fair trial;

5. Applicant complains that a fatal variance exists between the charging instrument and the evidence adduced at trial;

6. Applicant complains that he was denied due process by the State's use of a prior conviction, which is too remote for enhancement purposes and are part of his sealed juvenile record;

7. Applicant complains that the senior judge assigned to his case as a visiting judge, presided without being properly assigned to do so;

8. 8. Applicant complains that the State prosecutor willfully engaged in misconduct in violation of both die course and due process of law.

*State Writ Appl.* at 6-14, 10(a), 10(b) & 10(c).

V.

Argument & Authorities

This is a case of a woman scorned and a grandmother who did not want the Applicant as a member of her family and was willing to go to any extent to keep that from happening. Both used the actual victim or complaining witness (CW) to accomplish their goal and see to it Applicant was (a) punished for seeing another woman other than the CW's mother and be sent to prison for what amounts to nothing less than the rest of his life; and (b) a grandmother who was prejudiced against Applicant because he was white and not Hispanic, as well as her own personal distaste and dislike for him as a person. While these both may be rationales for eliminating someone from your life, they certainly are not justification for falsely accusing Applicant of sexually assaulting the CW.

## I.     Actual Innocence

In our State and under federal law there are two types of actual innocence claims; (1) in the *Schlup-type* claim, which is based upon constitutional error; and (2) *Herrera-*

*type* claims, which are based upon newly discovered evidence that conclusively establishes the innocence of the offender in question. In the present case, Applicant submits his claim of actual innocence is constitutional in nature based upon the deprivation and abridgement of his constitutional rights by the State used to convict him. The constitutional nature of Applicant's claim is that while it's true the CW testified he sexually assaulted her; there was absolutely no physical or other direct evidence to substantiate her claims. We as a society are repulsed by the prospect of being called and chosen as a juror, who is then subject to having to listen to a young woman describe deviate sexual behavior visited upon her years earlier by the defendant. Its hard for any defendant to overcome such prejudice that attaches to just being accused of such things, much less put on trial for them.

## Standard of Review

In *Schlup v. Delo*, 513 U.S. 298 (1995) was a case in which the United States Supreme Court expanded the ability to reopen a case in light of new evidence of innocence. Petitioner Lloyd E. Schlup, Jr., a Missouri prisoner under a sentence of death for the 1984 murder of an inmate named Arthur Dade, filed a habeas corpus petition alleging that constitutional error deprived the jury of critical evidence that would have established his innocence. The Court granted certiorari to consider whether the *Sawyer v. Whitley* standard provides adequate

protection against the kind of miscarriage of justice that would result from the execution of a person who is actually innocent.

The Court held that the standard of *Murray v. Carrier,* 477 U.S. 478, which requires a habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *id.,* at 496 - rather than the more stringent Sawyer standard, governs the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.

Applicant bases his actual innocence claim on the constitutional error of ineffective assistance of counsel prior to and during his trial. Therefore, Applicant incorporates by reference all of the arguments contained and briefed in his second ground seeking habeas corpus relief for all purposes, as they apply hereto.

## II.     Ineffective Assistance of Trial Counsel

In his second ground for relief, Applicant complains that he was deprived of his constitutional right to the effective assistance of counsel at trial in violation of the Sixth Amendment as follows: (1) Counsel was ineffective for failing to object and enter a plea to jurisdiction after the State arraigned Applicant and failed to read the enhancements paragraphs contained within the charging instrument, thereby failing to provide Applicant with sufficient

"notice" of what he had to defend himself against, resulting in Applicant initially at that point believing the enhancement paragraphs had been waived or abandoned by the State; (2) Counsel was ineffective for failing to object to prior conviction used for enhancement purposes not being available due to remoteness; (3) Counsel was ineffective for failing to object to an improper comment made by the prosecutor during *voir dire*, wherein she interjected her personal (not expert) opinion about how fast a females anus and vagina heal; (4) Counsel was ineffective for failing to object to the State using multiple outcry witnesses at trial without prior statutory notice being provided by the State. While counsel discussed the lack of notice during the proceedings, he failed to object to same and obtain an adverse ruling by the court, leaving nothing for direct review; (5) Counsel was ineffective for failing to secure a pretrial hearing concerning the multiple outcry witnesses the State had proposed and used at trial prejudicing the defense; (6) Counsel was ineffective for failing to obtain pretrial hearing to explore the obvious bias that existed between Margaret, the grandmother from the day she met the Applicant and the mother, who was spurned by Applicant providing motive for both to coax A.L. into making this false accusation against applicant; (7) Counsel was deficient by failing to object to the admission of State's exhibits 5-16, which were inherently prejudicial photographs of the victim that were not age relevant and were more prejudicial to the defense than probative, which prejudiced the defense and deprived Applicant of a fair trial; (8) Counsel was ineffective for failing to secure a forensic psychologist as an expert witness for the defense to assist with the defense by providing rebuttal expert witness to State's expert witness testimony; (9) Counsel was ineffective, as well as

14

the private investigator appointed to assist with the defense, as neither of them investigated St. Albans business records, *i.e.,* the release logs for children picked up from school Sanyas' claims Applicant picked A.L. up from school on the date the alleged offense was to have occurred; (10) Most onerous of all, counsel was ineffective for failing to interview any of the witnesses who Applicant provide names for to testify on his behalf during the guilt/innocence or punishment phase of the trial as character witnesses who were available and willing to testify favorably on behalf of the Applicant, prejudicing the defense.

**Standard of Review**

The right to effective assistance of counsel as set forth in the Sixth Amendment to the U.S. Constitution has been clearly established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). According to the Supreme Court in that case, the principles governing ineffectiveness claims should apply in Federal collateral proceedings as they do on direct appeal or in motions for new trial. An ineffectiveness claim is an attack on the fundamental fairness of the proceeding whose result is challenged. Since fundamental fairness is the central concern of the writ of habeas corpus, no special standards ought to apply to ineffectiveness claims brought by such a writ. The Supreme Court has stated the right to counsel is a fundamental right of criminal defendants; it assures fairness, and thus the legitimacy of the adversarial process. *Kimmelman v. Morrison,* 477 U.S. 365, 374 (1986). Furthermore, the Supreme Court has recognized that the right to counsel is the right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 (1970). The standard for establishing a claim of ineffective

assistance of counsel is enunciated in *Strickland v. Washington, supra.* In support of an ineffective assistance claim, the petitioner must show (1) counsel's performance was deficient, and (2) the deficient performance may have prejudiced the petitioner's case. *Strickland,* 466 U.S. at 688. Thus, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Counsel's performance must be judged on the totality of the representation. *Id.* at 670.

## *Trial Counsel's Affidavit*

As stated many times previously, Applicant is a layman of the law and in his first sub-ground (1) what he construes as being ineffective assistance of counsel for failing to enter a plea to jurisdiction, may have been better alleged as trial counsel being ineffective for failing to object after the court improperly arraigned the Applicant by failing to read the enhancement paragraphs at that time and Applicant avers Mr. Donahue was ineffective for failing to safeguard his procedural rights. In his second sub-ground (2) trial counsel responded that Applicant complains about him failing to object to the enhancement paragraph because of remoteness, which is true, but also based on the fact that enhancement was the result of a juvenile conviction Applicant received, which was sealed by that trial judge and should therefore been unavailable for enhancement purposes, which counsel failed to address in his affidavit. In sub-ground three (3) the Applicant complained that his attorney failed to object to an improper comment made by the prosecutor during the voir dire process and in counsel's affidavit he appears to try and alleviate any deficient conduct on his part by claiming

16

Applicant was making a "blanket statement" without specifying how the statement in question was improper. Applicant responds that it was improper because how fast a female anus or vagina heal" had absolutely nothing to do with the claims made by the CW against Applicant as they were too attenuated to have any physical evidence (healed or unhealed) be dispositive of the issue and only allowed the prosecution to create a false impression in the minds of the jury that: (a) there was some physical evidence that supported the CW accusations, when there was not and (b) also allowed the jury to think the offense had occurred more recently than when it had actually occurred, which is improper witness bolstering indirectly through the testimony in question. This prejudiced the defense. Applicant is not claiming, as counsel avers, that if he had sex with the CW there would be physical evidence of this occurrence, but to the contrary, that since the offense allegedly occurred in 2000 there would be no reason to have a rape kit or SANE examination conducted over ten-years later and was only completed by the State for improper bolstering purposes, which trial counsel sat idly by and allowed to confuse the jury and the correct perspective of the events. Counsel was ineffective for failing to object at this juncture of the proceedings. To prevail on an ineffective-assistance-of-counsel claim, Applicant must have demonstrate that his trial attorney's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In sub-grounds four and five, Applicant contends counsel was ineffective for failing to properly object to the State's use of multiple outcry witnesses when the State failed to demonstrate that everything was not revealed to the first outcry witness, providing a need for the

second. First of all there was no need for an outcry witness in this case period as the alleged victim was an adult at the time she brought charges against the Applicant for alleged unlawful conduct committed against her by the Applicant when she was a child.

<em>Standard</em>

There are four parts to qualifying a witness as an outcry witness. The witness must be under the age of fourteen or have a disability. The crime must be a sexual offense or assault type offense. The witness must have told the person the State is calling to testify the facts used to prove the criminal act. And the person the State is calling to testify must be the first person the outcry witness told. The Texas Code of Criminal Procedure section 38.072 will allow a person to testify depends on two factors. The two factors are whether the facts meet the requirements of CCP Rule 38.072 and whether the judge determines that the outcry witness is truthful at a hearing outside the presence of the jury. The Texas Code of Criminal Procedure Rule 38.072, lays out special procedures governing the admissibility of statements made by an outcry witness. If the State can qualify a witness as an outcry witness then the State can use someone other than the complaining witness ("victim") to testify at trial. The outcry witness can tell the jury the facts that the complaining witness told him to prove the criminal act. Rule 801(d), Texas Rules of Evidence, defines hearsay as an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Texas jurisprudence prohibits the use of hearsay unless it falls into one of the designated exceptions set forth in Rules 803 or 804—one of those exceptions being Art. 38.072 outcry testimony. Whether such testimony is admissible at a criminal trial is determined

18

by the Texas Rules of Evidence and the Sixth Amendment to the United States Constitution. In determining reliability, indicia of reliability is whether there is evidence of prior prompting or manipulation by an adult (influenced, for example, by bias the outcry witness may have against the defendant). Additional indicia of reliability is whether the outcry witness can, in a discernible manner, describe the alleged offense; and recall the time, content and circumstances of the outcry. The defendant has an indisputable procedural right under Art. 38.072 to explore these issues. While counsel made a fleeting reference to the State's use of two outcry witnesses at the part of the proceedings he cites to in his affidavit, (5 RR 57-60), he failed to object in latter portions of the proceedings to the same testimony being brought in by the State and had not obtained a global on-going objection to such evidence, which allowed it to come in through his deficient conduct in failing to make the proper objections and obtain the proper rulings from the trial court in this regard to protect Applicant's rights. The State failed to articulate any reasons on the record for justifying multiple outcry witnesses and Applicant asserts it was only done to bolster their case in general, prejudicing the defense. In his sixth sub-ground, Applicant is actually complaining that counsel was ineffective for failing to interview the outcry witnesses prior to trial in order to establish their personal bias and motives for wishing to see Applicant convicted to use during their cross-examination for impeachment purposes. *See McCoy v. Lynaugh*, 874 F.2d 954, 963 (5th Cir. 1989) (holding that attorney's performance deficient for failing to make an objection not considered being futile).

In sub-ground seven, Applicant complains that the numerous pictures introduced by the State of

the CW at ages much younger than at the time were more prejudicial than probative and should have been excluded from being published to the jury. In assessing a claim of ineffective assistance, an appellate court "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, the [appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex.Crim.App.2001), citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 205. In this instance, counsel cannot cloak his ineffectiveness concerning why the pictures in question were admitted without his objection, because the trial court has the discretion to admit them, without providing any indication pursuant to Applicant's allegations why it would have exercised its discretion to admit the photos had counsel timely objected. The prejudicial effect of showing the jury pictures of the victim much younger than at the time she testified as an adult is actually witness bolstering as it suggests to the jury some type of innocence attaches to the now adult victim that is associated with then then alleged child victim, which is improper and denied Applicant due process and a fair trial. Counsel's excuses provided in his affidavit are empty and self-serving, presented for only one purpose, to try and explain away his own deficient conduct. In sub-ground eight, trial counsel again provides self-serving conclusory excuses for his deficient conduct, which are unsupported by the record. Counsel claims he was attempting to keep a prior juvenile conviction for which Applicant was previously convicted of from becoming known to the jury and that is why he did not obtain funds for a forensic psychologist to assist with the defense, which makes

no sense in view of the fact such an expert would have aided the defense in jury selection, and in rebuttal to the expert used by the State. Not to open doors to Applicant's past (juvenile records which were sealed by the juvenile court and therefore unavailable for his adult trial in any manner) as counsel claims in his affidavit. In sub-ground nine Applicant stands by his allegation that counsel failed to investigate the school records of whether any logs were available to demonstrate who actually picked the CW up from school as alleged by same and the State's outcry witnesses. Counsel failed to subpoena any past teachers or principals to testify as to the policy that existed at the time Applicant was alleged to have picked up the CW from school and whether or not that would have been possible without the mother's written permission, which prejudiced the defense. And finally, as to sub-ground ten, character witnesses other than a family member are conducive to showing a jury that not only does a family member think the Applicant is a good and decent person, but also someone unrelated feels the same way, which would not be considered repetitive or cumulative as alleged by trial counsel in his affidavit at 3. Applicant attaches the affidavits of Margaret and Kenneth Irvin in support of his assertions there were character witnesses available and willing to testify on his behalf at the time of trial as Exhibits A & B.

In summary, Applicant avers based upon the totality of representation afforded him by trial counsel was so woefully lacking that it was impossible for him to receive due process and a fair trial and requests that this Honorable Court sustain this ground seeking habeas corpus relief.

## III. Ineffective Assistance of Appeal Counsel

In his third ground presented for habeas review Applicant asserts that in three different instances Appellate counsel's conduct fell below the professional norms for attorney's representing criminal defendants on appeal. Specifically, Applicant submits that counsel on appeal was ineffective for (1) failing to request oral argument; in his affidavit responding to the instant allegations of ineffectiveness, Mr. Bennett states, inter alia, that he did not "request oral argument, because the Waco Court of Appeals would not have granted oral argument in his professional opinion." *Id.* Affidavit at cover.

Counsel further stated he did not believe *in his professional opinion* that it would have changed the outcome of the appeal, which is both speculative and conclusory and provides no other reasoning supported by the record that oral argument would not have been of benefit to Applicant's appeal and therefore, he should be found to have been ineffective for not requesting oral argument based upon his baldly supported averments. (emphasis added). Counsel must act within the range of competence demanded of counsel in criminal cases. *Mc Mann v. Richardson*, 397 U.S. 759 (1970).

In his second contention, Applicant asserts counsel on appeal was ineffective for failing to present the non-frivolous issue concerning the testimony of the CW not being able to recall Applicant "placing his penis in her vagina during the time of the alleged assault," *Id.,* State Writ Appl. at 10, under an abuse of discretion claim against the trial court for failing to comprehend the missing requisite element in her testimony did not satisfy the State's burden to prove every

constituent element contained within the charging instrument, prejudicing the defense. The effectiveness of counsel is ordinarily gauged by the totality of the representation, but a single error, if sufficiently egregious, can constitute ineffective assistance. *Ex parte Felton*, 815 S.W.2d 733 (Tex. Crim. App. 1991).

## Standard of Review

In any case of alleged ineffective assistance the appellate court begins its review with a strong presumption that counsel was effective. *Jackson* v. *State,* 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). As such, the Court will presume that counsel's actions and decisions were reasonably professional and the result of sound trial strategy. *Id.* The burden is on an appellant to rebut this presumption. *Id.* To satisfy this burden an appellant must be able to point to specific, recorded instances of counsel's ineffectiveness. *Kemp* v. *State,* 892 S.W.2d 112, 115 (Tex. App.—Houston [1st Dist] 1994, pet. refd); *see also Garcia* v. *State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Consequently, the record on direct appeal may not be sufficient for a reviewing court to find counsel ineffective. *Jackson* v. *State,* 973 S.W.2d 954.

In his final sub-ground, Applicant complains appellate counsel was ineffective for failing to present the issue concerning the legality of the State using multiple outcry witnesses,. When it was unnecessary and unlawful to do so based on this record and is therefore unavailing.

Mr. Bennett, appellate counsel, in his affidavit responding to this allegation cited *Josey v. State*, 97 SW3d 687 (Tex. App. – Texarkana 2003, no pet.), "[T]o qualify as a proper outcry

statement, the child must have described the alleged offense in some discernible way and must have more than generally insinuated that sexual abuse occurred." Tear, 74 S.W.3d at 559 (citing Sims v. State, 12 S.W.3d 499, 500 (Tex. App.-Dallas 1999, pet. ref'd)); see also Garcia v. State, 792 S.W.2d 88, 91 (Tex.Crim.App.1990) (outcry must be more than general allusion of sexual abuse). Multiple outcry witnesses can testify about separate instances of abuse committed by the defendant if each witness is the first person to whom the child victim relayed information about the separate incidents. Tear, 74 S.W.3d at 559. "If the child victim first described one type of abuse to one outcry witness, and first described a different type of abuse to a second outcry witness, the second witness could testify about the different issue of abuse." Id. (citing Turner v. State, 924 S.W.2d 180, 183 (Tex. App.-Eastland 1996, pet. ref'd) (police officer could testify about victim's outcry about penile penetration because victim's previous outcry to counselor was about digital penetration)). Appellate counsel then fails to articulate how Josey v. State applies to the instant case, but instead to rely upon his personal, conclusory statement that because "a case can "involve multiple outcry witnesses," and a ruling by the trial court upon the admissibility of at least one of the outcry witnesses by trial counsel (the mother's outcry testimony), in appellate counsel's professional judgment he chose not to pursue such an issue because its unlikelihood of success on appeal was virtually non-existent. Id., Affidavit of E. Alan Bennett at 2. Applicant avers that appellate counsel's assertions are unsupported by the record and therefore should at the very least be considered specious by the habeas court.

## IV.    Abuse of Discretion by Trial Court.

In his fourth claim, Applicant complains that the trial court abused its discretion in several instances throughout his trial and in doing so, denied him due process of law and a fair trial as follows: (1) Denial of Applicant's timely request for a new trial presented to the trial court in a timely manner by trial counsel. In support of Applicant's Motion for a New Trial, trial counsel John Donahue executed an affidavit on August 08, 2011, stating the following:

1. I am an attorney licensed by the State Bar of Texas. I represented Bobby Joe Buckner, the defendant in the above-styled and numbered cause in which the State of Texas proceeded against Mr. Buckner under an indictment for aggravated sexual assault of a child. A jury convicted Mr. Buckner of this offense on July 15, 2011. The trial court assessed his punishment at 50 years' imprisonment and imposed sentence on the same day.

2. During voir dire, the venire members were asked if they or any family members had ever been a victim of aggravated sexual assault of a child or a similar crime. After the petit jurors were selected, sworn and impaneled, one of them, Mr. Brody Honea, asked to speak to the judge privately. In chambers and on the record, Mr. Honea advised that his step-sister had been sexually abused by his father. Mr. Honea stated that this would not impact his ability to be fair and impartial ibn Mr. Buckner's trial.

3. After trial, I learned Mr. Honea himself had been sexually abused by his father, and on another occasion had been kidnapped and the victim of an attempted sexual assault. If he had disclosed this information, I would have asked whether he could set his feelings aside about that and be fair and impartial in Mr. Buckner's trial, in an effort to challenge him for cause. If Mr. Honea had persisted that he would be fair and impartial in Mr. Buckner's trial, I would have exercised a peremptory challenge against him. *Id.*

*Affidavit of John Donahue* attached hereto and made a part hereof as Exhibit C.

Applicant has exercised due diligence in his discovery of Mr. Honea's misrepresentations to the trial court when questioned about a sexual assault involving his step-sister, but was not forthcoming at that time when he had the opportunity to make all parties and the trial court aware of his own personal history involving sexual abuse as a trial. As stated in Mr. Donahue's affidavit, had he knew about the circumstances concerning Mr. Honea's personal past he would have sought to challenge him for cause and failing that, he would have used a peremptory strike to preclude him from sitting on this jury. Not only because he had a personal history of sexual assault as a child, but because he willfully hid these facts from the Court and all other parties involved, which resulted in Applicant being denied due process and a fair trial.

## Standard of Review

Appellate courts afford "almost total deference" to a trial court's determination of historical facts that are supported by the record. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The trial court's fact findings are the who, when, where, how, or why. *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008). Fact issues encompass matters of credibility but not strictly legal issues like whether certain facts establish reasonable suspicion or probable cause. *Id.* Issues that hinge on intent or mental state are fact issues entitled to great deference. For example, the deliberateness of a "question first, warn later" approach to custodial interrogation is subject to great deference. *Carter v. State*, 309 S.W.3d 31, 39-40 (Tex. Crim. App. 2010). *See also Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011) (voluntariness of a defendant's depends on credibility and demeanor); *Watkins v. State*, 245

S.W.3d 444, 448 (Tex. Crim. App. 2008) (purposeful discrimination/Batson).Great deference applies to the determination of fact issues even if they are not based on credibility and demeanor. *Manzi v. State*, 88 S.W.3d 240, 243 (Tex. Crim. App. 2002). This is so even if the findings are based on: controverted affidavits, *Id.* at 244, uncontroverted affidavits, *Charles v. State*, 146 S.W.3d 204, 206 (Tex. Crim. App. 2004), or a videotape. *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). "Although appellate courts may review de novo 'indisputable visual evidence' contained in a videotape, the appellate court must defer to the trial judge's factual finding on whether a witness actually saw what was depicted on a videotape or heard what was said during a recorded conversation." *State v. Duran*, 396 S.W.3d 563, 570-71 (Tex. Crim. App. 2006). Deference is the proper standard when a video is admitted, even if it is not viewed by the judge. *Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012). Great deference applies even if the trial judge is not in an appreciably better position than the court of appeals to make credibility determinations. The deference afforded to a trial judge's determination of the facts is based on the expertise and experience judges acquire in fulfilling that role and the notion that substitution of an appellate court's judgment for that of the trial court would not be an efficient use of resources. *Manzi,* 88 S.W.3d at 243-44 (citing *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 573-75 (1985)). In this case, appellate counsel did not present this issue for the court of appeals to consider, although Mr. Donahue's affidavit was a part of the appellate record counsel was to master in perfecting Applicant's appeal. Nonetheless, the trial court, under these circumstances abused its discretion and Applicant is entitled by equity and due process to a

new trial in the interests of justice. In his second sub-ground, Applicant complains the trial court abused its discretion in failing to rule upon defense objection to the State's failure to provide timely notice concerning extraneous offenses, as requested previously by the defense; in his third sub-ground, Applicant complained the trial court erred and abused its discretion by denying the defense request for the inclusion of a lesser-included offense of indecency with a child by contact, wherein during trial some evidence of such a possibility was raised and could be adduced by the testimony and evidence presented at trial; and finally, in his fourth sub-ground, Applicant complained the trial court abused its discretion and denied him a fair trial by allowing Detective Bucher to show A.L.'s mother her previous statement made to police over the objection of defense counsel regarding a pocket knife she allegedly never seen Applicant in possession of previously in her prior statement to police, after she testified in court she had seen him in possession of a pocket knife making it a "reported recollection" versus a spontaneous one.

Applicant requests that this Honorable Court take judicial notice of the fact that the trial court fails to mention anything concerning this or any of the other abuse of discretion allegations presented in Applicant's writ application in its Findings of Facts and Conclusions of Law, nor was there any mention of these issues by the state in its original answer, which Applicant can only presume would be a general denial by the State based upon their silence in this regard.

## V.    Fatal Variance

Applicant complains in his fifth ground seeking habeas corpus relief that a fatal variance exists between the material allegations and the charging instrument in that the indictment handed up by the Grand Jury was based upon the amended version of the related penal code, instead of the penal code in existence at the time the alleged offense occurred. Specifically, at the time of the offense the law allowed for "contact" to be alleged as an element in addition to penetration alone, as the Code stated at the time Applicant was indicted. Applicant avers the State should have only been allowed to indict Applicant for the instant allegations based upon the Texas Penal Code in effect at the time of the alleged offense and his subsequent arrest and any amendments to that Penal Code after the offense occurred should have not had any force or effect on the Grand Jury's deliberations on whether or not to indict Applicant.

## Standard of Review

As a general rule a variance between the indictment and the evidence at trial is fatal to a conviction. *Corley v. State,* 158 Tex. Crim. 207, 254 S.W.2d 394 (1953). This is because Due Process guarantees the defendant notice of the charges against him. *Ward v. State,* 829 S.W.2d 787, 794 (Tex. Cr. App. 1992). Due Process is violated when an indictment alleges one offense but the State proves another. *Id*

Applicant respectfully requests that this Honorable Court to sustain this ground for relief and issue the writ.

## VI.    Remoteness of Enhancement

In his sixth ground presented for review, Applicant complains that he was denied due process of law by the State using a prior felony conviction for enhancement purposes, which was too remote to be used to enhance the instant offense. Specifically, the State alleged in one of the enhancement paragraphs alleged for enhancement purposes, that in cause number W-98-CR-029, Applicant was convicted on December 09, 1998, Applicant mistakenly pled "true" to the enhancement paragraph based upon the erroneous advice of counsel, when during the ten year period between the conviction in question in 1998 and the instant indictment Applicant had no other felony conviction during the intervening period. However, Applicant concedes that by entering the plea of "true" to the prior felony conviction used by the State for enhancement purposes, he also waived error in this regard.

## VII.    No Order of Assignment

In his seventh issue presented for habeas review, Applicant submits that the presiding judge, the Honorable George Allen, was a "visiting judge" and as such could only preside if properly assigned by the senior judge of the appropriate judicial region. The basic structure of the present court system of Texas was established by an 1891 constitutional amendment. The amendment established the Supreme Court as the highest state appellate court for civil matters, and the Court of Criminal Appeals, which makes the final determination in criminal matters.

Today, there are also 14 courts of appeals that exercise intermediate appellate jurisdiction in civil and criminal cases.

District courts are the state trial courts of general jurisdiction. The geographical area served by each district court is established by the specific statute creating that court. In addition to these state courts, the Texas Constitution provides for a county court in each county, presided over by the county judge. The county judge also serves as head of the county commissioners' court, the governing body of the county. To aid the constitutional county court with its judicial functions, the Legislature has established statutory county courts, generally designated as county courts at law or statutory probate courts, in the more populous counties. The presiding judge of an administrative judicial region may assign a judge to handle a case or docket of an active judge in the region who is unable to preside (due to recusal, illness, vacation, etc.) or who needs assistance with a heavy docket or docket backlog. These "assigned judges" may be active judges of other courts in the region or may be individuals residing in the region who used to serve as active judges. Sections 74.054, 74.056, and 74.057 of the Government Code discuss the assignment of judges by the presiding judges and the chief justice of the Supreme Court.

The record in this case does not contain any indicia of Judge Allen ever being properly assigned as a "visiting judge" to hear Applicant's case and therefore, Applicant submits every action by Judge Allen in his case should be considered a nullity.

## CONCLUSION

**WHEREFORE, PREMISES CONSIDERED**, Applicant would respectfully request that this Honorable Court sustain all the grounds presented herein for relief and issue the writ of habeas corpus.

**SIGNED** on this the 9th day of February 2014.

Respectfully submitted,

Bobby J. Buckner, **Applicant, Pro se**
TDCJ-CID #01740805
Estelle Unit
264 FM 3478
Huntsville, Texas 77320

32

38

## CERTIFICATE OF SERVICE

I, Bobby J. Buckner, Applicant, pro se, herein certify that I sent a true and original copy

of the foregoing instrument to: the McLennan County District Clerk and the McLennan County

District Attorney, by placing same, in the prison mail box, first-class, postage paid, addressed to:

**McLennan County District Clerk**
501 Washington Avenue #300
Waco, Texas 76701

**McLennan County District Attorney**
216 North 6th Street
Waco, Texas 76701

**SIGNED** on this the 9th day of February 2015.

Bobby J. Buckner, Applicant, Pro se

# EXHIBIT

A

Cause No.2009-385-C2A

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| BOBBY JOE BUCKNER, APPLICANT, | § | 54TH JUDICIAL DISTRICT |
| | § | |
| TDCJ# 01740805. | § | MC LENNAN COUNTY, TEXAS |

## AFFIDAVIT OF MARGARET IRVIN

STATE OF MISSOURI §

COUNTY OF TANEY §

KNOW ALL MEN BY THESE PRESENTS:

   **BEFORE ME**, the undersigned authority, personally appeared MARGARET IRVIN, who, after being duly cautioned and sworn deposed as follows: My name is MARGARET IRVIN and I reside at 312 North Sunshine, Branson, Taney County, Missouri, 65616. I am over eighteen years of age; of sound mind; capable of making this affidavit and personally acquainted with all the facts stated herein.

   "I am executing this affidavit on behalf of Bobby Buckner, TDCJ-CID # 01740805; currently incarcerated in the Texas Department of Criminal Justice, Correctional Institutions Division, assigned to the Estelle Unit located in Huntsville, Texas.

   "My husband Kenneth Irvin and I own Branson Motor Coach Specialists, Inc., located in Branson, Missouri and we, along with our children and grandchildren, have been in business as a family now for over 20 years. I have employed Bobby Buckner, the Applicant as a technician previous to his incarceration and he has always done a fantastic job. While I knew in the past that Bobby had some legal issues, it was abundantly clear that he had risen above that behavior and was building a good life for himself and his

family. He had paid for the earlier accusations and was on a good road for the rest of his life. His attitude and dedication was proof of that every single day. He had had proven himself to be of good character and I had always been impressed as with the level of his decent and honest character.

"His demeanor while employed at our company was one of respect and dedication. He was always on time or early for work, put in extra effort every single day, and took the repairs for which he was responsible to a personal level. When he worked on our customers' vehicles it was as if he was doing it for himself and always went the extra mile in satisfying those he did work for.

"With regards to the case mentioned above, Bobby Buckner, is currently appealing his case through the habeas post-conviction process in Texas for his wrongful conviction for aggravated sexual assault of a child. In this affidavit I am respectfully asking his case, and all of the facts material to his conviction be reviewed, as I believe a great injustice has occurred.

"Some trial excerpts contain very questionable testimony, which to me demonstrate some very out-of-the-ordinary and disturbing events occurred during his trial with regards to his conviction, and subsequent sentencing. In short, something surely is not right here, not right at all.

"To begin, the court documents stipulate that Bobby was arrested at his home; this is false. He was arrested at his place of employment. His wife even called to alert him that the officers were looking to arrest him just a couple of days before Christmas. He stayed at his post and performed his duties until the officers arrived. He did not run

because he did not believe he had any reason to run. He had done nothing wrong. Surely the legal system would protect him, or so he thought.

"My husband and I immediately made arraignments to secure bond for Bobby so he could be with his family for the Holidays and subsequently secured for him, an attorney at our expense, because I believe him to be innocent. My faith in Bobby is so strong that I had no issue with putting up our home as collateral for his bond and in order to secure enough credit to pay over $11,000 dollars to accomplish these things. Ultimately I had to use a credit card to make the payments for which, Bobby paid us back in full during the following years, and we paid the interest out of our own pockets because of our faith in him and belief he is innocent.

"In reading the trial transcripts further I was absolutely astounded that Bobby was found guilty at all, let alone being sent away to serve fifty (50) years in the Texas prison system. In one conversation between the D.A. and Detective Bucher, the detective was asked, 'Did you have an opportunity to speak with Bobby Joe Buckner at all during the course of your investigation?' to which the Detective answered, 'no.' (interesting due to the fact that Bobby was available at all times for questioning, etc.).

"The detective was then asked, 'In doing an investigation like this you didn't have any kind of scientific evidence that you were able to retrieve, did you?' Her answer was, 'no ma'am.' The next question to the Detective in reference to speaking with the Defendant, Bobby Joe Buckner was, 'After you spoke with all of these individuals did you then go obtain an arrest warrant for the Defendant?' to which her answer was, 'yes, ma'am'. From my understanding of the case, after having read the transcripts that were

supplied to us, I have to wonder how in the name of God, the Detective would have come to the ultimate conclusion to obtain an arrest warrant under these circumstances.

"The Detective, having taken statements from so-called witnesses, two of which were merely hearsay witnesses is not verifiable evidence. To me, it is beyond the pale of reason the State had no back up witnesses, (expert or otherwise), who had even taken the time to even speak to Bobby; I do not see how anyone could view this investigative process as being reliable. There was so much in the complaining witnesses' testimony that either did not ring true or was so fantastical it was beyond absurd.

"I wanted to execute this affidavit in order to demonstrate my personal perceptions concerning Bobby's character and my feelings that he is a decent human being and that he was and is a productive and contributing member of our society. Further, I intended to include the odd occurrences I found in the trial transcripts, but they are too many to list here.

"I humbly and respectfully request that Bobby Joe Buckner be given another chance to prove his innocence, hopefully this time with competent legal representation, as I believe that opportunity had not been afforded him at his first trial, in that, his paid attorney was woefully inadequate.

"Bobby was tried and convicted and sent to prison for what could very well be the rest of his life with virtually no evidence being presented against him. In my opinion, having read the trial transcripts, nothing more than hearsay was ever presented against him by the State and at best, that was unsubstantiated.

"I also wish for you to know that Bobby does have his job waiting for him should he prevail. I am very eager to have Bobby back here again representing the interests of our company."

**FURTHER AFFIANT SAYETH NOT.**

_Margaret Irvin_
**Margaret Irvin, Affiant**
312 North Sunshine
Branson, Missouri 65616

**State of Missouri §**
**County of Taney §**

SUBSCRIBED AND SWORN TO before me, the undersigned Notary Public by MARGARET IRVIN, who was personally known to me or identified himself by photo identification on this the 15th day of January, 2015.

**NOTARY PUBLIC IN AND FOR**
**THE STATE OF MISSOURI**

| DANNY R. FULLINGTON |
| --- |
| Notary Public - Notary Seal |
| STATE OF MISSOURI |
| Taney County |
| Commission #13791051 |
| My Commission Expires May 12, 2017 |

# EXHIBIT

## B

Cause No.2009-385-C2A

| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| BOBBY JOE BUCKNER, APPLICANT, | § | 54TH JUDICIAL DISTRICT |
| | § | |
| TDCJ# 01740805. | § | MC LENNAN COUNTY, TEXAS |

## AFFIDAVIT OF KENNETH IRVIN

STATE OF MISSOURI §

                     KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF TANEY §

**BEFORE ME**, the undersigned authority, personally appeared KENNETH IRVIN, who, after being duly cautioned and sworn deposed as follows: My name is KENNETH IRVIN and I reside at 312 North Sunshine, Branson, Taney County, Missouri, 65616. I am over eighteen years of age; of sound mind; capable of making this affidavit and personally acquainted with all the facts stated herein.

"I am writing this letter on behalf of Bobby Buckner, TDCJ-CID#01740805, currently incarcerated in the Texas Department of Criminal Justice, Correctional Institutions Division, assigned to the Estelle Unit located in Huntsville, Texas.

"My wife Margaret Irvin and I own Branson Motor Coach Specialists, Inc., located in Branson, Missouri and we, along with our children and grandchildren, have been in business as a family now for over 20 years. I have employed Bobby Buckner, the Applicant, as a technician previous to his incarceration and he has always done a fantastic job. While I knew in the past that Bobby had some legal issues, it was abundantly clear that he had risen above that behavior and was building a good life for himself and his family. He had paid for the earlier accusations and was on a good road for the rest of his

life. His attitude and dedication was proof of that every single day. He had had proven himself to be of good character and I had always been impressed as with the level of his decent and honest character.

"His demeanor while employed at our company was one of respect and dedication. He was always on time or early for work, put in extra effort every single day, and took the repairs for which he was responsible to a personal level. When he worked on our customers' vehicles it was as if he was doing it for himself and always went the extra mile in satisfying those he did work for.

"With regards to the case mentioned above, Bobby Buckner, is currently appealing his case through the habeas post-conviction process in Texas for his wrongful conviction for aggravated sexual assault of a child. In this affidavit I am respectfully requesting his case, and all of the facts material to his conviction be reviewed, as I believe a great injustice has occurred.

"There are some trial excerpts which demonstrate some very spurious and disturbing events occurred during his trial with regards to his conviction, and subsequent sentencing. In short, something is not right here, not right at all.

"To begin, the court documents stipulate that Bobby was arrested at his home; this is false. He was arrested at his place of employment. His wife even called to alert him that the officers were looking to arrest him just a couple of days before Christmas. He stayed at his post and performed his duties until the officers arrived. He did not run because he did not believe he had any reason to run. He had done nothing wrong. Surely the legal system would protect him, or so he thought.

"My wife and I immediately made arrangements to secure bond for Bobby so he could be with his family for the Holidays and subsequently secured for him, an attorney at our expense, because I believe him to be innocent. My faith in Bobby is so strong that I had no issue with putting up our home as collateral for his bond and in order to secure enough credit to pay over $11,000 dollars to accomplish these things. Ultimately I had to use a credit card to make the payments for which, Bobby paid my wife and I back in full during the following years, and we paid the interest out of our own pockets.

"In reading the trial transcripts further I was absolutely astounded that Bobby was found guilty at all, let alone being sent away to serve fifty (50) years in the Texas prison system. In one conversation between the D.A. and Detective Bucher, the detective was asked, 'Did you have an opportunity to speak with Bobby Joe Buckner at all during the course of your investigation?' to which the Detective answered, 'no.' (interesting due to the fact that Bobby was available at all times for questioning, etc.).

"The detective was then asked, 'In doing an investigation like this you didn't have any kind of scientific evidence that you were able to retrieve, did you?' Her answer was, 'no ma'am.' The next question to the Detective in reference to speaking with the Defendant, Bobby Joe Buckner was, 'After you spoke with all of these individuals did you then go obtain an arrest warrant for the Defendant?' to which her answer was, 'yes, ma'am'. From my understanding of the case, after having read the transcripts that were supplied to us, I have to wonder how in the name of God, the Detective would have come to the ultimate conclusion to obtain an arrest warrant under these circumstances.

"The Detective, having taken statements from so-called witnesses, two of which were merely hearsay witnesses, produced no verifiable evidence, no back up witnesses,

expert or otherwise, and not to have even spoken to Bobby, we cannot comprehend this investigative process as being reliable. There was so much in the complaining witnesses' testimony that either did not ring true or was so fantastical it was beyond absurd.

"My intent in executing this affidavit is to demonstrate our perceptions concerning Bobby's character and decency as a human being and that he was and is a viable and contributing member of our society. Further, I intended to include the odd occurrences I found in the trial transcripts, but they are too many to list here.

"I humbly and respectfully request that Bobby Joe Buckner be given another chance to prove he is innocent, hopefully this time with competent legal representation, as I believe that opportunity had not been afforded him at his first trial, in that, his paid attorney was woefully inadequate.

"Bobby was tried and convicted and sent to prison for what could very well be the rest of his life with virtually no evidence being presented. In my opinion, having read these transcripts, nothing more than hearsay was ever presented against him by the State and at best, that was unsubstantiated.

"Please know that Bobby does have his job waiting for him should he prevail. I am very eager to have Bobby back here again representing the interests of our company."

**FURTHER AFFIANT SAYETH NOT.**


**Kenneth Irvin, Affiant**
312 North Sunshine
Branson, Missouri, 65616

State of Missouri §
County of Taney §

SUBSCRIBED AND SWORN TO before me, the undersigned Notary Public by

KENNETH IRVIN, who was personally known to me or identified himself by photo

identification on this the ___15th___ day of ___January___, 2015.

NOTARY PUBLIC IN AND FOR
THE STATE OF MISSOURI

DANNY R. FULLINGTON
Notary Public - Notary Seal
STATE OF MISSOURI
Taney County
Commission #13791051
My Commission Expires May 12, 2017

# EXHIBIT

## C

36

52

No. 2009-385-C2

| STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | McLENNAN COUNTY, TEXAS, |
| | § | |
| BOBBY JOE BUCKNER | § | 54th JUDICIAL DISTRICT |

### AFFIDAVIT OF JOHN DONAHUE, TRIAL COUNSEL
### FOR DEFENDANT BOBBY JOE BUCKNER

STATE OF TEXAS
COUNTY OF McLENNAN

Before me, the undersigned authority, on this day personally appeared John Donahue who, after being duly sworn, stated as follows:

1. I am an attorney licensed by the State Bar of Texas. I represented Bobby Joe Buckner, the defendant in the above-styled and numbered cause in which the State of Texas proceeded against Mr. Buckner under an indictment for aggravated sexual assault of a child. A jury convicted Mr. Buckner of this offense on July 15, 2011. The trial court assessed his punishment at 50 years' imprisonment and imposed sentence on the same day.

2. During voir dire, the veniremembers were asked if they or any family members had ever been a victim of aggravated sexual assault of a child or a similar crime. After the petit jurors were selected, sworn and impaneled, one of them, Mr. Brody Honea, asked to speak to the judge privately. In chambers and on the record, Mr. Honea advised that his step-sister had been sexually abused by his father. Mr. Honea stated that this would not impact his ability to be fair and impartial in Mr. Buckner's trial.

3. After trial, I learned that Mr. Honea himself had been sexually abused by his father, and on another occasion had been kidnapped and the victim of an attempted sexual assault. If he had disclosed this information, I would have asked whether he could set his feelings aside about that and be fair and impartial in Mr. Buckner's trial, in an effort to challenge him for cause. If Mr. Honea had persisted that he would be fair and impartial in Mr. Buckner's trial, I would have exercised a peremptory challenge against him.

John Donahue

SWORN TO AND SUBSCRIBED BEFORE ME this ___8___ day of August, 2011.

Notary Public, State of Texas

AMANDA LEE NEILL
Notary Public, State of Texas
My Commission Expires
May 05, 2014

53

CAUSE NO: 20090385C2A   FILE DATE: 12/05/2014 STATE OF TEXAS VS BUCKNER,BOBBY JOE
OFFENSE: POST CONVICTION WRIT OF HABEAS CORPUS 11.07                    DA: REYNA,ABEL

          PARTIES TO THE CASE          P/D    ATTORNEY

      02 BUCKNER,BOBBY JOE             D 01 PRO SE

  DATE      PARTY   ORDER OF THE COURT

12/05/2014          COVER LETTER FROM DEFENDANT
12/05/2014          APPLICATION FOR A WRIT OF HABEAS CORPUS SEEKING RELIEF FROM
                    FINAL FELONY CONVICTION UNDER CODE OF CRIMINAL PROCEDURE,
                    ARTICLE 11.07
12/08/2014          CERTIFICATE OF SERVICE
12/08/2014          EMAIL RECEIPT FROM GABE PRICE
12/08/2014          EMAIL RECEIPT FROM STERLING HARMON
12/19/2014          STATE'S ANSWER TO AN APPLICATION FOR WRIT OF HABEAS CORPUS
12/23/2014          DESIGNATION OF ISSUES ON AN APPLICATION FOR WRIT OF HABEAS
                    CORPUS
12/23/2014          C/STATE'S ANSWER & DESIGNATION OF ISSUES MAILED TO DEFT
12/23/2014          C/LETTER MAILED TO CCA WITH C/C DESIGNATION OF ISSUES
12/23/2014          C/APPLICATION,STATE'S ANSWER & DESIGNATION OF ISSUES MAILED
                    TO ATTY'S J.DONAHUE AND E.ALAN BENNETT
 1/15/2015          AFFIDAVIT OF E.ALAN BENNETT
 1/16/2015          C/AFFIDAVIT EMAILED TO DISTRICT ATTORNEY'S OFFICE
 1/16/2015          C/AFFIDAVIT MAILED TO DEFT
 1/16/2015          EMAIL RECEIPT FROM STERLING HARMON
 1/16/2015          EMAIL RECEIPT FROM GABE PRICE
 1/21/2015          AFFIDAVIT OF JOHN DONAHUE
 1/26/2015          C/AFFIDAVIT EMAILED TO DISTRICT ATTORNEY'S OFFICE
 1/26/2015          C/AFFIDAVIT MAILED TO DEFT
 1/27/2015          EMAIL RECEIPT FROM GABE PRICE
 1/27/2015          EMAIL RECEIPT FROM STERLING HARMON
 1/27/2015          FINDINGS OF FACT AND CONCLUSIONS OF LAW ON AN APPLICATION
                    FOR WRIT OF HABEAS CORPUS
 1/30/2015          C/FINDINGS AND CONCLUSIONS OF LAW MAILED TO DEFT
 2/03/2015          CLERK'S RECORD MAILED TO COURT OF CRIMINAL APPEALS
 2/09/2015          NOTICE FROM CCA - WRIT RECEIVED
 3/20/2015          COVER LETTER FROM DEFENDANT
 3/20/2015          APPLICANT BUCKNER'S TRAVERSE TO THE STATE'S ORIGINAL ANSWER
                    WITH BRIEF IN SUPPORT

THE STATE OF TEXAS

COUNTY OF McLENNAN

I, JON R. GIMBLE, Clerk, District Courts in and for McLennan County, Texas, do hereby certify that the above and foregoing are true and correct copies of the following instruments, to wit:

1. NOTICE FROM COURT OF CRIMINAL APPEALS – WRIT RECEIVED

2. COVER LETTER FROM DEFENDANT

3. APPLICANT BUCKNER'S TRAVERSE TO THE STATE'S ORIGINAL ANSWER WITH BRIEF IN SUPPORT

4. DOCKET SHEET

in Cause Number 2009-385-C2A in the 54th Judicial Court of McLennan County, Texas Styled:

---

**EX PARTE: BOBBY JOE BUCKNER, APPLICANT**

---

as same appeal from original instruments now on file in the office of which I have legal custody.

TO CERTIFY WHICH WITNESS MY HAND AND SEAL OF SAID COURT, at my office, in city of Waco, County of McLennan, Texas this the 20TH day of MARCH, 2015.

JON R. GIMBLE Clerk

District Courts, McLennan County, Texas

(seal)

By _Crystal Howard_ , Deputy.

CRYSTAL HOWARD